## ORTON vs. NOONAN and another.

*Lease construed: Demise for future term, at lessee's option, or covenant to renew?*

1. By a certain instrument, A. and B. lease to C. and D., their heirs, etc., a certain amount of water at a certain dam, for four years; and after a covenant by lessees to pay a specified rent, and one by lessors to raise the dam, etc., and a stipulation that lessees might purchase the water in question at a specified price, a clause is added by which lessors "further covenant and agree that in case [lessees] shall not purchase the water as hereinbefore provided, and shall signify their wish to [lessors], their heirs, etc., at the expiration of this lease, to have the same extended, they [lessors] hereby covenant and agree, for themselves, their heirs, etc., to extend the lease for the term of ninety-nine years; provided always, that in case said lease shall be so extended," the lessees shall pay a certain annual rent. DIXON, C. J., was of opinion that this was not merely a *covenant* to renew, but was a *demise* for a future term of ninety-nine years, to take effect at lessees' sole option, and on the giving of said notice; and that the plaintiff, as assignee of the lessors, could recover in an action upon the lease for rent alleged to have accrued after the expiration of the four years' term, the lessees having given due notice of their election to have the lease extended, and no instrument having ever been executed for the purpose of renewing or extending said lease.

    COLE, J., was of the opposite opinion.

    PAINE, J., did not sit in the case.

2. The fact that in a former suit by the present defendants against the present plaintiff, the complainants therein sought to compel the execution of a new lease in form for ninety-nine years, and that the defendant in that suit (the plaintiff herein) demurred to that bill on the ground that the covenant to renew was a personal covenant of the original lessors and did not bind him; and the determination of the court in that suit, that "the covenant to renew the lease ran with the land, and bound the defendant as assignee of the reversion," do not estop the present plaintiff from now claiming that said lease was a demise for the ninety-nine years, which took effect upon the giving of due notice by the lessees. Per DIXON, C. J.

APPEAL from the Circuit Court for *Milwaukee* County.

On the 8th of January, 1851, E. B. Wolcott, T. C. Dousman, and Z. A. and S D. Cotton, as parties of the first part, and *J. A. Noonan* and *Peter McNab*, as parties of the second part, executed an "indenture of lease," which provided as follows: "The said parties of the first part, in consideration of the rents reserved and

the covenants hereinafter contained, do hereby demise and lease unto the said parties of the second part, their heirs, executors, administrators or assigns, one thousand cubic feet of water per minute from the water-power of the said parties of the first part at the village of Humboldt, in the county of Milwaukee, in the state of Wisconsin, the said one thousand cubic feet of water to be taken from the dam in the said water-power and conveyed by them, in a flume constructed for the purpose, to the paper-mill of the said parties of the second part, located on a part of lots two, three and four in block one in said village of Humboldt: To have and to hold the said one thousand cubic feet of water per minute unto the said parties of the second part, their heirs, executors, administrators and assigns, for and during the full term of four years from and after the date hereof * * yielding and paying therefor the yearly rent of two hundred dollars in semi-annual payments." Then followed a covenant by the lessees for the payment of said rent.

The lessors further agreed, 1. That "within a reasonable length of time" they would raise the dam, by which said power was created, to the height of sixteen feet, and keep it in good repair, etc.    2. That the lessees, at any time during the term of the lease, might have the privilege of purchasing said water at the price of $3,000, and have a warranty deed thereof. 3. The lease then contains the following provision: "And the said parties of the first part further covenant and agree, that in case the said parties of the second part shall not purchase the water as hereinbefore provided, and shall signify their wish to them, the said parties of the first part, their heirs or legal representatives, at the expiration of this lease, to have the same extended, they, the said parties of the first part, hereby covenant and agree, for themselves, their heirs or legal representatives, to extend the lease for

the term of ninety-nine years: provided always, that in case the said lease shall be so extended, the said parties of the second part shall pay the yearly rent of three hundred dollars, payable semi-annually, to the said parties of the first part, their heirs or legal representatives." There was a further provision that until the said dam should be raised to the height of sixteen feet as before provided, the parties of the second part, their heirs or assigns, should have the right to draw an amount of water equivalent to one thousand cubic feet per minute discharged under a head of sixteen feet; and also that the lessees, at any time thereafter, during the term of four years, on signifying their wish in writing to the lessors, might have an additional amount of water, not exceeding one thousand cubic feet per minute, provided that the additional amount so desired should be specified in the written notice to be given as aforesaid; and that lessees should pay for said additional water the yearly rent of fifty dollars for each one hundred cubic feet per minute, payment to be made as above described; and if lessees should elect to take any such additional water, then, if the lease should be extended at the expiration of said four years, the extension should apply to such additional amount of water, on payment of the rent therefor as aforesaid. There were some further provisions, which are not important here; and it was declared that all the covenants contained in the lease should extend to and bind the respective parties, their heirs, executors, administrators and assigns.

The complaint in this action, after setting up the above described lease, alleges that the defendants, who are the lessees named therein, by virtue thereof, entered into possession of the demised premises; that on the first of November, 1852, the above named lessors sold and conveyed to the plaintiff the whole of said water power, including the demised premises; that on the 22d of December, 1854, defendants served

upon plaintiff a notice in writing that they elected to take an additional one thousand cubic feet of water per minute on the terms mentioned in the lease, and also to renew the lease, at the expiration thereof, for the term of ninety-nine years, on the terms therein mentioned; that defendants, in 1853 and 1854, attorned to plaintiff and paid him rent on said lease, in all the sum of $300; that all the time since plaintiff became purchaser of said premises, defendants have been in the constant use and enjoyment of the same, and have received and used *under said lease* eight thousand cubic feet of water per minute, from the water-power of the plaintiff; that by reason thereof, before the commencement of this action, the sum of $50,000 became due and payable to plaintiff from said defendants, with interest thereon from the time said rents became due *according to the terms of said lease,* and that no part of said sum has been paid except the $300 aforesaid. Judgment is therefore demanded for said sum, with interest, etc.

The defendants demurred to so much of the complaint as alleges rent due and unpaid for the additional one thousand cubic feet of water per minute, and seeks to recover the same, and also to so much of the complaint as alleges rent due and unpaid, and seeks to recover the same, for any period of time after the 8th of January, 1855, on the ground that those parts of the complaint did not state facts sufficient to constitute a cause of action. The plaintiff appealed from an order sustaining the demurrer.

*J. J. Orton,* appellant, in person, argued, 1. That the contract above described is not a lease, technically so called, as it conveys no land. *Mitchel v. Warner,* 5 Conn. 497; *Wheelock v. Thayer,* 16 Pick. 68; 21 Barb. 478; *Chynoweth v. Tenney,* 10 Wis. 397; Taylor's L. & T. §§ 251, 260, and cases there cited. 2. That if it is a lease, the complaint is good, and shows a renewal of the lease and possession thereunder. 1 N. Y. 419;

*Beale v. Sanders,* 32 E. C. L. 354; 18 Conn. 222; *Home v. Beers,* 24 Barb. 525; *Cream v. Cush,* 7 Gray, 550; 2 Duer, 435; Taylor's L. & T. § 661.  3. That in any case the complaint is good as in an action to collect rent.  R. S. ch. 91, secs. 2 and 17; ch. 125, secs. 3, 21, 22; *Ackerman v. Lyman,* 20 Wis. 454; 15 id. 134; 16 id. 504; 13 Johns. 297; 15 id. 505; 2 Duer, 435; 6 Wend. 569; 1 Pick. 332; 4 Cush. 384; 4 McLean, 572; 2 Pa. St. 144; 35 id. 45; 25 E. C. L. 253; 32 id. 354; 41 id. 270; Taylor's L. & T. §§ 55, 58, 635, 636.

*I. P. Walker,* for respondent, argued that the facts stated in the complaint did not show any renewal of the lease, and the fact that there was no such renewal is assumed in former decisions of this court in actions between these parties involving a construction of the same instrument.  4 Wis. 335, 341; 20 id. 283.  The complaint therefore does not state facts sufficient to sustain the action, which is upon the defendant's covenants in the lease.  *Kellogg v. Nelson,* 5 Wis. 125; *Warren v. Bean,* 6 id. 120.

*Jason Downer,* on the same side:

There is a class of cases where the tenant may, by acts on his part, shorten or lengthen, terminate or continue the lease.  But such leases show clearly on their face the intention of the parties that the *sole* act of the tenant should have such effect.  *Monson v. May,* 7 Blackf. 403; *Chretien v. Doney,* 1 Coms. 420; *House v. Burr,* 24 Barb. 425; and *Hull v. Spaulding,* 24 N. H. 259, are such cases.  But here the lease on its face shows clearly that there was an act to be done by the lessors.  They covenanted to extend, etc.  2. The covenant to *extend* for ninety-nine years is the same as a covenant to *renew* for that time; and courts of equity decree specific performance of such covenants.  Taylor on L. & T. § 332, and cases there cited.  But this would not be done if the lease could be renewed by the act of the lessees alone.  3. The lease does not even require

Orton vs. Noonan and another.

the notice to extend for ninety-nine years to be in writing. Is it at all probable that the parties could have intended that a lease should by a verbal notice (or even by a written one) be extended through successive generations? 4. After the four years, if the lease was extended, a larger rent was to be paid, and more water might be embraced in the extended lease, at a still higher price. It is not probable that all these things were to remain evidenced only by a notice given by the tenant. Evidently the parties contemplated a new lease for ninety-nine years, in such form that it could go on record, and be notice and evidence of title to property to descend to successive generations. 5. In 4 Wis. 335, and several other opinions of this court on this lease, this court has construed it as clearly giving the lessees a right to renewal in form. We submit that plaintiff is estopped by those decisions from now claiming otherwise. *Van Pelt v. Kimball*, 18 Wis. 362, and cases there cited. If the question of estoppel is not raised in the pleadings, still the court should judicially take notice of its own decisions, and be governed by them as conclusive authority on the question of renewal.

Dixon, C. J. Aside from any complications or difficulties growing out of the protracted litigation between these parties (of which I shall speak hereafter), I cannot but regard the question now presented as a very plain one. I think it is so as well on the language of the lease as on authority. But if the language were less clear, or its construction doubtful, and yet the authorities clear, decided and unconflicting, as I conceive them to be here, it is just one of those questions upon which I should feel bound to defer to the opinion and judgment of other courts. It is a common law question as to the construction or effect of a clause in the lease providing for an extension of it. It is a question which has arisen elsewhere under the very

same circumstances, and has been adjudicated by courts acting upon the same principles and governed by the same rules as this court; and those adjudications, appearing to have been fully and well considered, and to sustain each other, ought to be regarded as very certain, if not conclusive evidence of what the law is. Error with regard to them is not to be presumed, nor are we to assume greater wisdom or more profound judgment than other courts which have gone carefully over the same ground before us. Their decisions are to stand as witnesses of the law, unless overcome by overpowering reasons to the contrary. We are accustomed to so regard them in all our business transactions requiring reference to legal principles. Gentlemen of the legal profession so constantly look upon them, and act and advise and direct others with respect to their most important pecuniary interests and affairs; and such decisions are every day so quoted and relied upon in all our courts of justice. It is of the greatest moment, therefore, that we adhere to them. It gives certainty to the law and stability to the right of individuals, where otherwise all would be doubt and confusion. It is upon considerations like these that I should, even though the words were not clear or the construction uncertain, feel bound to yield to the united opinion and judgment of other courts upon the same point. But, as I have said, I cannot look upon the language here as at all ambiguous, or the construction in doubt; and hence I have the greatest reason for concurring with those courts by whom the same question has already been decided.

The question, and the only one, in my view of the case, which it becomes necessary to consider, is, whether this lease was to stand as the lease for the extended term of ninety-nine years at the election of the lessees, or whether, at the expiration of the first four years, a new lease was to be executed for such extended term. This is purely a question as to the

intention of the parties, to be gathered from the language of the lease itself. I am of opinion that no new lease was contemplated; and in support of this view I shall examine the question, first, upon the language itself of the lease; and afterwards I shall refer to the decided cases, by which, as I think, this position is clearly and fully sustained.

And in the first place I observe, that there is nowhere to be found in the lease any words by which the making or execution of any new lease is expressly provided for, or from which it is fairly and clearly to be implied. And observing this, and finding the rule to be laid down, as will hereafter be seen, that such agreements, to be construed as executory and to require the execution of a new lease, must expressly so provide, I have been led to examine somewhat into the adjudged cases in chancery where the specific performance of such covenants has been decreed, and I find in all of them that it was upon language from which the intention to require a new lease most clearly and unequivocally appeared. The words, *to grant a further lease under the same rents and covenants, to seal and execute a new lease, to renew the lease at the same rent and on the same covenants, to grant a new lease, to renew the lease upon such terms and for such rent as may be agreed upon, to renew the lease at the expiration of the term at a fair valuation by persons indifferently chosen between the parties,* or some other equivalent expressions clearly evincing the understanding of the parties that a new or further lease was to be made and delivered, are to be found in every case. The following are some among a greater number of cases which I have examined upon this point: *Bridges v. Hitchcock,* 5 Brown's C. P. 6; *Tritton v. Foote,* 2 Brown's Ch. 497; *Hyde v. Skinner,* 2 Peere Williams, 196; *Moore v. Foley,* 6 Ves. 232; *Whitlock v. Duffield,* 1. Hoff. 110; *Willis v. Astor,* 4 Edw. 594; *Rutgers v. Hunter,* 6 Johns. Ch. 215; *Carr v. Ellison,* 24 Wend. 178; *Piggot v. Mason,* 1 Paige, 412.

Now, if the lease in question had contained any of these or the like provisions, it would have removed all doubt as to its construction. If, for example, the agreement had been *to renew the lease under or on the same covenants,* such specification as to the nature or kind of covenants to be inserted would have shown that the execution of a new or further lease was intended. Or if it had been provided that the lease should be *renewed upon such terms and for such rent as might be agreed upon, or at a fair valuation by persons indifferently chosen between the parties,* the intention to make a new lease would have been clearly manifested. The terms, rent, etc., not being fixed by the first lease, a second one would be required. The absence of all of these and of every similar provision in this lease, and the absence of any adjudged case in which, without them, it has been held that the agreement or covenant was executory and not executed, are both to my mind very strong circumstances going to show that such is not its true character. When I speak of the absence of any adjudged case, I do not of course wish to be understood as affirming that I have examined every one of the multitude of cases of the kind. My time would not permit of this. I assume, if any different cases or any in point upon the language of this lease could be found, that they would not have escaped the vigilance and industry of the learned and experienced counsel engaged in this litigation. I think I hazard nothing in saying that no such cases. can be found, and that a decree directing the execution of a new lease upon the language of this covenant would be without a precedent in all the books; whilst, on the other hand, decisions that such a covenant is executed and passes a present interest, and does not rest in contract merely, are very numerous. The rule to be derived from the adjudged cases, therefore, would seem to be not that contended for by the learned counsel for the defendants, but rather the opposite.

They argue that the lease should clearly show on its face the intention of the parties that the *sole* act of the tenants in choosing to have it extended should have that effect. In other words, they argue that the lease must clearly show on its face the intention of the parties *not* to execute a new one. On the contrary, the rule as I find it laid down, and as I believe to be sustained by all the authorities, is, not that the lease must clearly negative or deny the intention of the parties to make a new one, but that it must clearly and positively show on its face that such *was* their intention. If it be not so clearly and positively shown, the presumption is that no new lease was intended, and that the tenant was to continue to hold under the original one. Courts decree the execution and delivery of a new lease only upon the *express* agreement of the parties to that effect. And the reason of the rule is obvious. The new lease, when executed, is but a substitute for the old one. It is in no respect more efficacious or obligatory, nor are the rights or liabilities of the parties either greater or less. The courts will not, therefore, infer that the parties intended to go through this ceremony of taking up one paper and laying down another of precisely the same tenor and effect, unless it has been expressly so stipulated, or unless there appears some other good reason for it, and that the parties intended it. The inference is, not that the parties intended such needless trouble and expense, but the reverse; and the courts, acting for the best interests of the parties, and not sitting in judgment upon matters of mere form, will not aid in the ceremony, except upon the obligation of the parties created in so many words. And it is for the same obvious reason, also, that the courts lean to the construction that such covenants are executed, and give to the lessee, at his election, a vested interest in the term. If it is clear that the lessee or tenant is entitled to hold for such additional or extended term, as it

must be before the court can direct the execution of a new lease, then such construction is the most favorable for all the parties concerned. It gives to the lessee or tenant what he claims, and by a more sure and indefeasible title; whilst the rights and liabilities of the landlord remain unchanged. Such I understand to be the settled rule of construction, and such the reasons for it.

But aside from and beyond this absence of all words in the present lease expressly showing that the parties intended to make or require a new one, the very language of the covenant here, as it seems to me, forbids any such idea, and brings the case within the negative rule contended for by counsel for the defendants. The important words of this covenant are, that if the lessees shall signify their wish to the lessors, their heirs or legal representatives, "at the expiration of *this* lease, to have *the same* extended, they (the lessors) hereby covenant and agree for themselves, their heirs or legal representatives, to *extend* the lease for the term of ninety-nine years." Again, it is provided in a subsequent covenant, "*if this lease shall be extended* at the expiration of the said four years, that the *extension* shall apply," etc. The covenant then was, if the lessees so signified their wish to the lessors, *to extend this lease* for the term of ninety-nine years. It is possible that I may be in error, and may mistake the meaning of these words; but it does seem to me that they are just such words as any intelligent and competent conveyancer would have used, if the intention of the parties had been, not to require the execution and delivery of a new lease, but to make the act of the lessees in signifying their wish the only thing requisite to create the extension. The verb *to extend* implies far less in this connection than the verb *to renew*, found in other cases. In fact it has nothing of the same strength and significance. *To extend* is to draw forth or stretch; to prolong; to protract; to continue. *To renew* signifies to.

make over; to make anew; to give new life to; to restore; to recreate; to rebuild. Each word is so defined by the lexicographers. The covenant *to extend this lease*, therefore, means no more than to prolong or to continue it at the option of the lessees, or that it shall be so prolonged or continued, which clearly forbids the inference that a new lease is to be executed. The language implies as clearly as language can, that if the lessees so signified their wish, the lease was to be a continuing one. Every provision *is* made for *its* continuance. The term, the rent, the times of payment, the manner of drawing the water, and every condition to the minutest particular are distinctly stated and agreed upon. Nothing is left to be ascertained or made more clear and definite by a new lease. Indeed that would be impossible, and the new lease, if executed, could be but a repetition word for word of the old one with respect to all the terms and conditions of the extended term. It appears to me, therefore, that these words are in no sense stronger or more conclusive for the purpose of showing that a new lease was intended, than would have been the words *with the privilege to have, with the privilege of keeping, with the privilege if desired, or at the option of the lessees for the further term of,* which, upon the event happening, have been adjudged to require no new writing or agreement, but to operate as a continuous lease and possession. *Chretien v. Doney,* 1 N. Y. 419; *Manson v. Wray,* 7 Blackf. 403; *House v. Burr,* 24 Barb. 525; *Kramer v. Cook,* 7 Gray, 550; *Hull v. Spaulding,* 42 N. H. 259. They are obviously but different modes of expressing the same intention.

But it is said that a new lease must have been intended, because the notice to extend was not required to be in writing. It might be verbal. Notice in writing was in fact given, but no matter. The question is asked: "Is it at all probable that parties *intended* that a lease should, by *verbal* notice,

or even written, be extended through successive generations for near a hundred years?" I reply in the form of interrogation also: Which is the more important, the continuation of this lease for ninety-nine years, or the formal execution and delivery of a new one for the same term? Is it at all probable that the parties could have *intended* that the execution and delivery of a new lease to extend through successive generations for near a hundred years, or their rights to demand and enforce it, should depend upon the giving of a *verbal* notice, or even a written one? Do the learned counsel intend to argue against their own case by endeavoring to convince this court that no extended term could have been intended by the parties because the notice was or might be verbal? If the extension of the same lease upon a mere verbal notice be so improbable as to disprove the intent, does it not equally disprove the intent to execute a new lease for the same term? This argument seems to me to destroy itself by proving too much. The improbability is just as great in the one case as in the other. It was undoubtedly competent for the parties to provide for the giving of a verbal notice in either case, and whichever way they intended the lease to operate; and this fact neither makes for nor against either construction of the language. If an extension of the same lease was intended, then the giving of the notice was all that was necessary, and thereafter the holding and possession of the lessees as of the extended term, and the payment and acceptance of the first semi-annual installment of rent, would become conclusive evidence of the rights of all parties concerned during all the remaining years of the term. And if any controversy or litigation arose, it would arise at the outset, as it has done here, when all the facts were fresh and the witnesses living. I do not therefore see that it could possibly add to the certainty of the transactions, or more effectually per-

petuate the remembrance or evidence of them, that a new lease should be executed.

And again, in all the cases last above referred to, and most of which are cited with approbation by the learned counsel for the defendants, though they attempt to distinguish them, the notices by the tenants of their election or desire to continue for the extended term, were verbal. If the language of this lease had been the same, would the counsel contend that the provision for verbal notice would operate to defeat the agreement and cut short the term to the time first specified in the lease? I think not.

Another argument is, that larger rent was to be paid after the first four years, and that this shows that the making of a new lease was intended. How so? Is not the larger rent clearly and explicitly fixed and provided for, and its payment covenanted and agreed upon, in and by the lease already made? Is it possible to make any more clear, definite or certain provision for it by any new lease? The specific agreement already made with regard to it, instead of tending to show that a new lease was intended, seems to me most strongly, if not conclusively, to sustain the opposite inference. And besides, this is not a new question. It has been adjudicated that the agreement for larger rent for the extended term does not imply that a new lease is to be executed.

Another, and I believe the last, argument founded on the language of the lease, to prove that the execution of a new one was intended, is, that the words *hereby covenant and agree to extend* imply future action on the part of the lessors—some affirmative act to be done by them, their heirs or legal representatives, in order to extend it. These words, it is said, mean that they were to make out and deliver another lease. It is manifest that the whole force of this argument rests upon the use of the verb, *to extend*, in the infinitive mood. Now it is possible that in the nicest and most.

strict grammatical sense, the use of the present infinitive in such connection may denote future action; but, unfortunately for this argument, the courts, in construing the contracts of parties precisely so worded, have failed to heed or be governed by grammatical niceties of this kind. Their minds have been occupied with graver considerations and more solid reasons for settling the construction and determing the intent of the parties than such precise grammatical tests, which, if acted upon, would amount to nothing; and this argument, which is very old, was long ago repudiated by courts of the highest character for ability and sound learning, and their decisions have remained unquestioned law to this day.

Having thus spoken of the lease as it appears to me on its face, and adverted to those authorities which have a strong collateral bearing upon the question, it remains for me to refer to and examine some of those in which the question has been directly considered and decided. And first, I notice the case of *Ranlet v. Cook*, 44 N. H. 512, which is clearly and fully in point. The language of the lease there was even stronger than it is here. Like the present lease it was of a right to draw water for the purpose of propelling machinery. It was a lease for ten years at an annual rent of *one hundred* dollars, in which the lessors " covenanted with the lessees that they would, at the end of said ten years, *renew* the said lease for a further term of ten years, the rent for said last ten years to be *one hundred and twenty-five* dollars annually." It was a bill in equity by the lessee against a person holding a subsequent lease from the same lessors of another right to draw water from the same canal. The object of the bill was to restrain such subsequent lessee from drawing water to the damage and injury of the plaintiff and in disregard of his rights. The bill averred that the indenture or lease had been renewed according to the covenant. The facts were, that no new lease or

writing had been executed, but that the plaintiff had continued in possession for the further term, paying the increased rent. The plaintiff was then so holding for the further term, and based his right to maintain the action upon that fact and the covenant to renew. The action was sustained, and upon this point the court say: "This lease to the plaintiff was given for ten years, which would extend to 1858, with a provision that it should *be renewed* for ten years longer, upon certain terms, which is equivalent to *extending* the lease for that time. Now a lease for ten years, with such an agreement that it should be renewed or extended for ten years longer, is a sufficient lease for twenty years." The point and applicability of this decision cannot be questioned, and as it is has not escaped the observation of counsel for the defendants, it may be proper to notice their comments upon it. They say it was an equity case to establish the plaintiff's priority of right as first lessee, and that the court in such case should decide that his right in equity to the renewal or extension of his lease placed him upon the same footing as to priority, as if it had actually in form been extended or renewed at the time it ought to have been. But this equitable ground, whether right or wrong, was not the one upon which the court rested its decision. The court put it upon the broad legal principle, that the covenant to renew at the expiration of the first term took effect as a renewal or extension of the lease for the further term at the election of the lessee, and that no new or further lease was contemplated by the parties, or was necessary. The case contains not the remotest allusion to any other ground for the decision, and this ground is as applicable to an action at law as in equity, or to one between the lessor and lessee, or either of those parties and third persons. And that case was strikingly like the equity case between these same parties for the specific performance or execution of a new lease, which

is now on the calendar of this court for decision; and as I am writing this opinion for the equity case as well as this, I may properly allude to it here. The equity case is a suit by the lessees against a person holding title by purchase from the lessors subsequent to the execution of the lease. The case above referred to was a suit by the lessee against a party having title or an interest in the premises by lease subsequently executed by the lessors. In both alike the title or interest of the defendants in the property was after-acquired from the lessors, and in the equity case here, if the title or interest of the defendant were by lease, the cases would be exactly parallel. It clearly can make no difference with the application of the principle to the equity case here, whether the defendant has title in fee from the lessors or by lease for the period of five hundred or one thousand years. Nor will any one insist upon a position so absurd as that this court should recognize and apply the principle in the equity case, and yet reject it in this one.

The next cases, or class of cases, to which I shall refer, are those in which the question has so frequently arisen as to whether agreements of this nature were in themselves leases or merely operated as contracts for leases to be executed and delivered at some future day. As the cases of this kind are very numerous and in no way conflicting, it will be needless for me to refer to more than two or three of the leading ones. *Hallett v. Wylie*, 3 Johns. 44, was an action of debt for one year's rent. The deed or instrument produced by the plaintiff on the trial purported to be a "*memorandum for a lease* made and entered into the 26th day of February, 1804, by which the plaintiff *agreed to let on lease* to the defendant, for the term of four years from the first day of May, *then next*, the house," etc. The lessee having entered and occupied for about half a year, the house was destroyed by fire. The court said it was a hard case upon the defendant, and that if

they could, consistently with settled and established principles, relieve him against the payment of the rent in question, they should most willingly do it. But they said it could not be done without overturning a series of decisions to which they were bound to conform. They sat there "*jus dare*," not "*jus facere*." The point was urged, that the writing upon which the suit was brought was a mere agreement for a lease, but not a lease  To this the court answered, that "the period for which the premises were demised, as well as the terms upon which they were to be held, are definitely and accurately stated. Nothing, in our opinion, can be clearer, than that this is, to all intents and purposes, an executed contract. If the defendant had filed a bill for a specific performance, there can be no doubt that the chancellor would have told him, he had already the legal estate, and that he could not interfere."

*Thornton v. Payne*, 5 Johns. 74, was a like case. It was an action of covenant, in which the declaration stated "that by certain articles of agreement, *dated the 7th day of January*, 1806, between the plaintiff and defendant, the defendant *bargained, covenanted and agreed* with the plaintiff, that he *would let and hire to him* a certain farm, etc., for the term of six years, *from the 1st of April*, 1807." The case came up on demurrer, and one question presented was, whether the article set forth in the declaration was a lease, or merely an agreement for a lease. The exact words of the article do not appear by the report, but I take it, from the language of the pleading and all the circumstances of the case, that they must have been the same as in the former case and as in this one, a covenant and agreement *to let and hire*. And it will be observed here, also, that the tenancy was not to commence until a year and three months after the date of the agreement, and that the lessee had not gone into possession. The court speaking by SPENCER, J., say: "The case, therefore,

rests on this·: whether the article is a lease *in presenti*, or an agreement for a lease." And then, after referring to and commenting upon *Hallett v. Wylie*, they add : " In making that decision the court was governed by the fact that there was nothing in it to show that the parties contemplated any further assurance ; and it was there held, that the words implied a present demise ; the period for which it was to be held, and the rent, being definitely and accurately stated. The only circumstance differing this case from that is, that there the lessee went into possession under the instrument. But that alone cannot give a different effect to the articles now under consideration. I will barely observe, that in every case decided in the English courts, where agreements have been adjudged *not to operate by passing an interest, but to rest in contract*, there has been either *an express agreement for a further lease*, or construing the agreement to be a lease *in presenti would work a forfeiture, or the terms have not been fully settled, and something further was to be done.* In the present case the words imply an immediate demise ; *there is no stipulation for a further lease ; the term, the rent, and the manner of occupying the farm, are all explicitly stated.* We are, therefore, of opinion that the plaintiff acquired by the article all the rights of a lessee from the first of April, 1807."

To these decisions by a bench confessedly as able as any, and by very many considered the ablest we have ever had in this country, I do not deem it requisite to add others, though such may be found. They go as fully and directly to the very point here as any decisions can go. They control the construction of the present lease, if it is to be controlled by judicial authority at all. Substitute the verb *to let* for the verb *to extend*, in this lease, and the covenants are the very same. And the fact that the term here granted was limited to commence at the expiration of a prior term given by the same instrument, and for which

the lessees were in possession, still more strongly favors the same construction.

My opinion therefore is, that upon the face of this lease, and independently of any extraneous circumstances connected with it, no new lease was intended or can be required; and it remains for me now only to consider some arguments addressed to this court founded upon such extraneous facts.

The litigation between these parties, with respect to the lease, commenced in 1855, soon after the expiration of the short term, by the filing of the bill for specific performance. That suit has been pending ever since. It has been twice before this court upon appeal from orders made in it. 4 Wis. 335; 21 id. 283. It is now before this court for the third time, upon appeal from final judgment in favor of the complainants. The defendant in that suit, the plaintiff in this, has resisted the bill on various grounds, as that the covenant did not run with the land and bind him, etc., which grounds have been overruled by this court. But the ground here assumed has never before been taken or relied upon. This question is now presented for the first time. Counsel admit this, and do not urge or insist that it has ever been considered or decided by this court. It clearly never has been. If it had, it would be *res adjudicata* between these parties, and conclusive. But now it is an open question, as was decided in *Akerly v. Vilas*, 23 Wis. 207. The objection then is, that the plaintiff, in his defense of that suit, having taken positions inconsistent with that now assumed, ought not to be heard upon it— that a party to a suit, having problems of law to present, must not delay until the final hearing, but must bring them forward early, or he will be precluded or cut off, as it were, by a kind of estoppel. How often has it happened in the history of a long litigation of this nature, that a party, after having exhausted the learning and resources of various counsel without

avail, has employed others, who, upon the presentation of some new proposition or different principle of law applicable to it, have at once brought the controversy to a successful termination? And who, in such cases, ever heard that the party was precluded or estopped by the mistaken views or oversight of former counsel, so long as the question had not passed into judgment against him? Counsel cite no authority for this position, and it would certainly be very strange if they could. The mistakes and oversights of this kind, of parties and of their counsel, and of the courts also (which are quite as apt to make them as counsel)—the case still remaining open and unde termined, so that the question may be considered— all go for nothing. No one is concluded or bound by them.

But it is furthermore insisted that these acts are to be taken into account as furnishing evidence of the intention of the parties under the words of the lease. They are acts by a party struggling for the advantage pending a protracted and most earnestly contested litigation, and with reference to it, which detracts very much, if not entirely, from their force. They are acts by a person not himself a party to the lease, and therefore not supposed to know the intention of the makers at the time it was drawn up and executed. But, aside from these considerations, I do not understand that the acts of the parties to a legal instrument can be considered for the purpose of determining its construction. In very doubtful cases they may perhaps be looked at for the purpose of giving effect to the instrument; but if the language is clear or susceptible of interpretation without, they cannot. In *Baynham v. Guy's Hospital*, 3 Vesey, 297, which was the case of a lease and right claimed to renew, the acts of the parties were invoked for this purpose. The master of the rolls, afterwards Lord ALVANLEY, and who was one of the ablest equity jurists of his time, said

that he strongly protested against the argument as to construing a legal instrument by the equivocal acts of the parties and their understanding upon it, and that he never would construe a covenant so And in *Poole v. Bentley*, 12 East, 167, the question being upon a lease also, Lord ELLENBOROUGH said: "The rule to be collected from all the cases is, that the intention of the parties, as declared by the words of the instrument, must govern the construction." *Abeel v. Radcliff*, 13 Johns. 300, is to the same effect, where, speaking of a covenant in a lease, the court say they are bound to construe the words of it *per se*. And in *Ranlet v. Cook*, *supra*, the rule is stated as follows: "Whatever the understanding may have been between the parties as to the effect or construction of these leases, still we can only give them such a construction as their terms will warrant."

I have thus carefully examined the whole ground of this case, and of the other one connected with it; and in view of all the questions presented and arguments made, I must say that it seems to me a very plain one. The principles involved are clear, and certainly the authorities not in doubt. I think the lease was extended by the giving of the notice, and that the complaint here states a good cause of action upon the covenants for the payment of the rent.

The other questions argued, as to the construction of other parts of the lease, and the right of the defendants to the gratuitous use of the surplus water, are not involved on this demurrer. They are questions of damages, which will properly come up on the trial of the cause, but cannot now be considered. The only question here is, whether the complaint states a good cause of action for the recovery of rent both before and after the 8th day of January, 1855; and, if it does, it is not demurrable because more rent is demanded or greater damages claimed than the plaintiff will ultimately be entitled to recover.

I think the order sustaining the demurrer should be reversed, and the cause remanded for further proceedings according to law.

Cole, J.  I am unable to sustain this action as one upon the covenants of the lease.  For this assumes that the lease and its covenants are in full force and existence ; in other words, that the lease was renewed or extended by the notice of the lessees that they elected to have it extended for the term of ninety-nine years.  Is, then, the instrument a lease *in presenti*, not only for the term of four years, but likewise for the term of ninety-nine years ?  Or is it an agreement on the part of the lessors and their assigns to renew or extend the lease for ninety-nine years upon the conditions therein stated, providing the lessees signify their wish, at the expiration of the term, to have the same so extended ?  I am of the opinion that it is an agreement to renew the lease for ninety-nine years, and not a present demise for that period, to become operative upon the lessees giving the notice.

Of course, it is a cardinal rule in the construction of a contract, where there is any doubt as to its true character, to discover the real intention of the parties from the whole instrument.  And this intention is to prevail, when ascertained.  Did, then, the parties contemplate the giving of a future lease for ninety-nine years upon the lessees signifying their wish to have one for that period ?  It seems to me that a reference to some clauses in the instrument will show that this question must be answered in the affirmative.

The indenture of lease was made and entered into on the 8th day of January, 1851, between Erastus B. Wolcott and others, of the first part, and the defendants, of the second part.  By the first clause, " the said parties of the first part, in consideration of the rents reserved and the covenants hereinafter contained,

do hereby demise and lease unto the parties of the second part, their heirs, executors, administrators, or assigns, one thousand cubic feet of water per minute, from the water-power of the said parties of the first part, at the village of Humboldt,   *   *   the said one thousand cubic feet of water per minute to be taken from the dam on the said water-power, and conveyed by them, in a flume constructed for that purpose, to the paper-mill of the said parties of the second part, located   *   *   in said village of Humboldt; to have and to hold the said one thousand cubic feet of water per minute unto the said parties of the second part, their heirs, executors, administrators and assigns, *for and during the full term of four years from and after the date hereof, fully to be ended and completed,* yielding and paying therefor the yearly rent of two hundred dollars in semi-annual payments." Then follows a covenant by the lessees to pay the rent; one on the part of the lessors to raise the dam within a reasonable time to the height of sixteen feet, and to keep the dam and flume conveying the water in good repair; and a stipulation that the lessees might purchase the water leased at a specified sum; and then this clause: " And the said parties of the first part further covenant and agree, that in case the said parties of the second part shall not purchase the water as hereinafter provided, and shall signify their wish to them, the said parties of the first part, their heirs or legal representatives, *at the expiration of this lease, to have the same extended,* they, the said parties of the first part, *hereby covenant and agree for themselves, their heirs or legal representatives, to extend the lease for the term of ninety-nine years; provided, always, that in case the said lease shall be so extended,* the said parties of the second part shall pay the yearly or annual rent of three hundred dollars, payable semi-annually, to the said parties of the first part, their heirs or legal representatives."

There is a provision in the lease by which the

lessees, at any time during the term of four years, upon signifying their wish in writing to the parties of the first part, were to have an additional amount of water, to be drawn from the dam and used for the mill, not exceeding one thousand cubic feet per minute; provided, always, that the additional amount so desired should be specified in the written notice given, and that the lessees should pay the rent agreed upon, and that " if the said parties of the second part shall elect to take any additional water, as aforesaid, then, and *in that case, if this lease shall be extended at the expiration of the said four years,* the extension shall apply to such additional amount of water on the payment of the rents therefor as aforesaid." I have thus quoted *in extenso* those clauses of the lease bearing upon the question under consideration; and they seem to me to supersede the necessity of any extended argument in support of the construction I place upon the instrument. They clearly provide, as it appears to me, that the lessors shall give a future lease for ninety-nine years, providing the lessees shall signify their wish, at the expiration of the lease, to have the same renewed or extended for that period. It was a lease for four years, at a specified rent, and, at the expiration of that time, might be renewed for the further term of ninety-nine years at the option of the lessees. The lease would not be renewed by the lessees giving the notice, but it was essential that the lessors do something on their part. They covenanted to renew or extend, which implies affirmative action by them. As was remarked by the counsel for the respondents, there is a class of cases where the tenant may, by act or acts on his part, shorten or lengthen, terminate or continue the lease; but in those cases the instruments show on their face the intention of the parties that the *sole* act of the tenant should have that effect. These cases are numerous, but I do not care to cite or comment upon

them.   Sometimes the question has arisen, whether the instrument contained words of present demise, which would operate as a lease.   Such are the cases of *Poole v. Bentley*, 12 East, 168 ; *Pinero v. Judson*, 19 Eng. C. L. 56 ; *Hallett v. Wylie*, 3 Johns. 44 ; *Weld v. Traip*, 14 Gray, 330 ; *Thornton v. Payne*, 5 Johns. 74 ; and many others of like character.   But these cases are all distinguishable from the one at bar.   Here, according to my understanding of the language employed, the parties contemplated the execution of a future lease.   And I have found no case which I think would be an authority for holding that by the mere giving of the notice by the lessees, the lease would become operative as a lease for ninety-nine years from the 8th of January, 1855, without any act or thing being done by the lessors, so that an action at law can be maintained for a breach of its covenants.   Such a construction, I think, does violence to the plain import and intent of the contract.   And it is a significant fact, one not without weight in determining the meaning of this instrument, that the theory that the lease with its covenants was renewed for the period of ninety-nine years, is now for the first time advanced or insisted upon.   In 1855, a bill was filed by the respondents to enforce a specific performance of the covenant to renew the lease.   The appellant has resisted with great persistency the relief prayed for in that suit, upon the ground that the covenant to renew was a personal one, not running with the land, and therefore not binding upon him as the assignee of the reversion.   4 Wis. 335 ; 21 id. 283 ; 22 id. 84. Able and astute counsel have been engaged on both sides in that action.   And yet it has not before been suggested that a specific performance of the covenant to renew was needless, for the reason that the lease was renewed or extended by the giving of the notice on the part of the lessees.   If that were so, then it is manifest that the efforts of the complainants in the

equity suit to obtain specific performance of the covenant to renew were quite unnecessary, and those of the defendant to defeat such relief were practically hopeless and unavailing. The burden was already fastened upon the estate for the term of ninety-nine years. These unequivocal acts of the parties show what has heretofore been the understanding of the parties of the effect of the contract, and that they supposed a further lease was necessary. And this I think the more natural and rational construction of the contract. So I am unable to say that the lease was extended merely by the lessees giving the notice that they elected to have it extended for ninety-nine years.

Is, then, the action maintainable for use and occupation of the premises? I cannot see why it is not. And the authorities cited by the appellant, under the third point in his brief, show that the action is maintainable upon that ground. See particularly the cases of *Abeel v. Radcliff*, 13 Johns. 296; *Same case*, in 15 id. 505. What amount the appellant will be entitled to recover, is a question which does not arise upon this demurrer. If he can recover anything, the demurrer should not have been sustained.

*By the Court.*—The order of the circuit court sustaining the demurrer is hereby reversed, and the cause remanded for further proceedings.

*Jason Downer*, for the respondents, argued, that the complaint was exclusively upon a *sealed* lease, treating it as in full force up to the commencement of the action, and was not for use and occupation (2 Chitty's Pl. 41); and that there could be no recovery, as for use and occupation against one holding under such a lease. R. S. ch. 91, sec. 17.* In *Elliot v. Rogers*, 4

---

* Sec. 17, ch. 91, R. S., reads as follows: "Any landlord may recover, in a civil action, a reasonable satisfaction for the use and occupation of any

Esp. R. 59, it was held that, if the demise was by deed, there could be no recovery on a count for use and occupation; and this was admitted to be so in *Abeel v. Radcliff*, 13 Johns. 298. The latter was an action of assumpsit, for use and occupation; and the question was, whether the defendant held under a sealed lease; he claiming, and the plaintiff denying, that he did so. But here the complaint avers the making of the sealed lease, and that the defendant used the water "under said lease," to the commencement of the action, and that there is due for the water, "according to the terms of the lease," etc. 2. He further contended, that even if there were a count for rent under the lease, during the four years' term, and a separate count for the use and occupation since the expiration of that term, there could be no recovery under it, whether it be held that the lease took effect as a demise for ninety-nine years, or that defendants were rightfully in possession under plaintiff's valid covenant, under seal, to extend the lease. Counsel distinguished this case from that of *Abeel v. Radcliff*, by the fact that there the covenant to renew was *void*, and the plaintiff there had offered to renew for the full term that the covenant would have required if it had been valid; and from that of *Ackerman v. Lyman*, 20 Wis. 454, by the fact that there was no *tortious entry* in this case. 3. He further urged, that, if it should finally be held, in the suit in equity brought by *Noonan & McNab* against *Orton*, and still pending, that *Noonan & McNab* are entitled to a new lease from *Orton*, antedated to the day when the four years' term expired, *Orton* could only recover on the defendants' covenants

lands or tenements by any person under any agreement not made by deed; and if any parol devise, or other agreement, not being by deed, by which a certain rent is reserved, shall appear in evidence, on the trial of any such action, the plaintiff shall not, on that account, be debarred from a recovery, but may make use thereof as evidence of the amount of damages to be recovered."

in that lease; and he could not so recover before performance of his covenant to renew (1 Wms. Saund. 319, and notes; 2 Smith's L. C. 16–25); and that no relief should be granted in this action inconsistent with the final decision which might be reached in the other.

The motion for a rehearing was denied at the June term, 1870.